At all versus Omnicare Incorporated at all, argument not to exceed 15 minutes per side. Mr. McNeila for appellants. May it please the Court. My name is Andrew McNeil and I'm an attorney who has been involved with Kirby McIlwain representing the plaintiff's appellant in this case, KVC Asset Management. With the Court's permission, I have requested five minutes of your time. The primary issue on this appeal is straightforward. Is the company liable under the securities laws for claiming that its billing practices materially outlied with applicable regulations, where the company's own head of internal audit conducted no less than three audits, each of which found substantial noncompliance with those same regulations, and where the record is devoid of any evidence providing a objectively reasonable basis for the company's stated opinion? And the law of the circuit is clear that the answer is yes. As this Court held in the city of Monroe and in Helwig, when a company volunteers to speak on an issue of soft information, it is nonetheless obligated to disclose information that it knows tends to seriously undermine the veracity of its stated belief. Here, Omnicare volunteered its purported belief that it was in material compliance with the billing regulations. It didn't have to. It chose to. It did so despite the fact that it conducted no less than three audits, which are known as the Wave I, the Wave II, and the Pharmacy audits, which found widespread violations of Medicaid and Medicare reimbursement requirements. Now, these three audits at issue here examined thousands of reimbursement requests submitted over several years by Omnicare facilities located across the country. So these were just not, you know, little picky-goon findings in little remote areas. These were audits that looked at numerous claims over numerous years from across the country, so both geographically and temporally diverse in what they found. As I understood it, at least as far as the complaint goes, it doesn't give specific numbers. That is, it doesn't say 300 out of 400 were bad. It said that they found significant, substantial things of that sort. How do we – and there were no external bodies that had dinged them for this – so how do we compare materially compliant versus substantial noncompliance? Isn't that kind of the essence of soft information? If they said they were 90 percent bad, I could argue that that's material. If it's 10 percent or 5 percent, how do you address that? Well, I understand your question, Your Honor, and I would say that that is a fairly textual argument, what under given circumstances would constitute material versus nonmaterial compliance. I guess as a preliminary matter, I would say that generally speaking, materiality determinations are best left to the jury for that very reason. Looking under PSLRA? Even under PSLRA, materiality determinations generally are fact-specific determinations that are left to the jury. And the site did several cases in our brief on that. Does that include the strong evidence of cyanter? Well, here, you're right, there is a little wrinkle in the case insofar as – If I say material, you say nonmaterial, how strong is my knowledge that my use is different from everybody else's use of the word? Correct. Your Honor is correct that when it comes to soft information in the 10B-5 context, which is where we are, the cyanter element and the materiality elements merge to some degree because in order to show that soft information is actionable, you have to show that there's knowledge of falsity. Here, I understand the question of what is material, and I think you do have to look at the specific facts of the case. You do have to look at who conducted these audits, right? These are not audits that are being performed by some low-level employee in the company. These are audits being performed by the head of the internal audit, whose job it is to determine whether or not the company is, in fact, compliant with the laws. Is there a question whether there had to be communication alleged in the complaint from, say, the person who did the audits to, say, individual defendants? And what would you point us to in the complaint that shows that there was that communication? Sure. And again, the knowledge issue would be twofold. There is showing knowledge on behalf of the individual defendants for them to be personally liable, and then there's the issue of the corporate defendant and showing knowledge that the corporate defendant was aware of the falsity of the statements. With respect to the record, we say at a minimum it shows that there is knowledge on behalf of the individual defendants who come under, as well as Omnicare. In the complaint, I believe we point to Paragraph 193, where we indicate that the results of the pharmacy audit were brought to Mr. Gumunda's attention by the head of internal audit, Mr. Stone. Subsequently, Mr. Stone was terminated, and that was one of the claims that was brought up in his False Claims Act case. And I should note that out of the various claims he brought up, that one did survive. The retaliatory termination claim that the head of internal audit brought on the ground that he was fired after bringing these various violations to management's attention. So you have that communication. In addition to that, and it's worth noting again why these were material audits, it wasn't just the head of internal audit who conducted them. The head of the Chief Compliance Officer, Mr. William Prince Patrick, he was also involved in carrying out the Wave 1 and Wave 2 audits and doing the hex interviews. He, too, spoke to Mr. Gumunda, and we point that out in Paragraph 82, where it says that he sort of echoed the concerns of the various folks that they had in their hex interviews, echoed the concerns of Mr. Stone, and brought those to Mr. Gumunda's attention. That would be Paragraph 82 of the complaint? Now, you know, as a matter of... It says, specifically, he, she advised counsel that, as you were told by other people, I did my best to bring him to the head, but it didn't work. That's correct. He spoke with... I think Paragraph 82 says that he went to Mr. Gumunda. I believe it's specifically referred to Mr. Gumunda. That confidential witness was ultimately out at the district court level, I believe, in the course of argument that it was, in fact, the former Chief Compliance Officer, Mr. William Prince Patrick. He, I believe, from Paragraph 82, spoke to Mr. Gumunda, mentioned that he had compliance-based concerns. Now, what were the compliance-based concerns? Well, the only audits he was involved with were the Wave 1 and Wave 2 audits, as we detail in the complaint. Those were the concerns that were mentioned to Mr. Gumunda, and it was subsequent to that that he ultimately decided to resign from his position. So, between both Mr. Stone and Mr. Prince Patrick, we believe that those allegations were sufficient at the pleading stage, you know, to establish that this communication, this information was communicated to Mr. Gumunda. But even... I'm sorry, Your Honor. You obviously have a very short amount of time. Can you be sure to read the rest of the statute and what allegations you have in the complaint that are sufficient to meet the statute requirements? Absolutely, Your Honor. I'll go on to that right now. As previously mentioned, when you have a Tempe case involving soft information, the same facts that tend to show knowledge of falsity for the purposes of establishing materiality are going to be the same factors that would indicate scienter. And those under Helwig would be, for example, knowing possession of internal reports that would contradict your public statements, as well as disavowing the most recent information and stating an opinion outwardly. You also have, of course, the suspicious timing of two of the senior persons within Omnicare departing from the company just before they publicly disclosed the PFAM action, the False Claim Act, the Claims Act action that was brought against the company, and also the retaliatory termination of their head of internal audit, which, again, was a claim that survived in the district court in, I believe, it's Indiana. So those factors would show scienter on behalf of the company. It's just a fundamental factor showing scienter is possession of adverse information that you don't disclose that would contradict your public statements. With the brief time I do have on my opening, I do want to make a point, though, that even if the information is not sufficient to show the direct knowledge of any individual defendant, we have pledged sufficiently the knowledge on behalf of the corporate defendant through the knowledge imputed from several non-defendant senior members of Omnicare's staff. Again, we have John Stone, the head of internal audit. That was a senior position, as defendants admit. He was responsible for reviewing their SEC files with respect to compliance-based issues. You have the former chief compliance officer, Mr. Fitzpatrick, who participated in the Wave 1 and Wave 2 audits. His knowledge would be imputed to the corporation. You have Mr. Patrick Heath, who was the chief operating officer. He's the one who commissioned the Wave 2 audit in order to assess whether or not the Wave 1 audits results were anomalous. So, again, showing why this is material, you have two of the most senior people in the company taking part in these audits. They get the results of the first audit, and then the chief operating officer says, well, let's see if this is actually something that happened because of its routine. It was just a mistake. Well, let's see if there's evidence that this is something that has been ongoing further. That's why they commissioned the Wave 2 audit. The Wave 2 audit, of course, found significant substantial additional violations. So you have some of the most senior people in the company commissioning the audits, taking an interest in the audits, and asking for follow-up audits based on the results. So I think that would answer both Your Honor's question about why are the auditors demonstrating material noncompliance and why also would there be knowledge sufficient to impute to the corporation itself. Am I right? You had, through these complimentary witnesses, you had these audits at the time you brought the complaint. Is that right? We had the allegations that Mr. Stone set forth in the PTAM action. We don't actually have the results of the audits themselves, Your Honor. Did any of those give numbers? Like, it is my opinion that 20% of the claims are fraudulent or 2% or 50%. Well, no. These were samples that were done. They did give numbers in terms of the amount of claims that were looked at, and they were in the thousands. What you did have, though, was Mr. Stone, and again, these allegations were contained in this PTAM action, found, based on the amount, the sheer number of errors in the sample that he did, that these were widespread and systematic. So to answer his, again, his adjectives, it's not definitively hard numbers like 80 out of every 100 are false. But what he found was that there was significant noncompliance. It was widespread, and it was significant enough, again, for other folks to commission additional ones. Thank you, Your Honor. Thank you, Your Honor. Thank you. Good morning, Your Honors. Yogi Berra once described the feeling I have standing here as deja vu all over again. For as much as the plaintiff will try to distance himself from this court's prior precedents, the issue on this appeal is the same as the issue that was before this court in Omnicare Warden. We're not writing on a clean slate here. As another panel of this court recognized just two weeks ago in Daly v. Bedlock, and I quote, And that's all that we have here, a generic statement of legal compliance without any specifics. There are five different grounds on which this court can and should affirm the decision below. No objective falsity, no subjective falsity, lack of materiality, lack of sienna, and no lost causation. Take your pick. Let's begin with objective falsity. This one is easy, and I want to address Judge Bob's question. It's undisputed that the Stone audits covered only a very small sampling of one of Omnicare's ancillary businesses, representing a tiny fraction of its total operations. Less than 2% of Omnicare's revenues come from ancillary businesses. And what did those audits reveal? They revealed, at most, loss or incomplete documentation for real transactions representing an immaterial portion of Omnicare's revenues. The Wave 1 audit only examined transactions between 2000 and 2005, not even during the class period. Seven years before the class period began. And, to give you numbers, the errors found in the Wave 1 audit, and these come right out of the Stone PTM complaint, accounted for less than $500,000 of revenues over a five-year period. But didn't the audits show that there was a fairly significant percentage of the matters examined that showed defective documentation or other problems? You have Mr. Stone characterizing it as significant. But the actual numbers that he reports in his complaint doesn't tell you how many transactions out of how many other transactions had these deficiencies. What he did say is he found, in the case of Medicare, about $137,000 worth of transactions, and about $300,000 and some odd thousand dollars worth of Medicaid transactions over five states that had loss or missing documentation. If the base of examined was $10 million, then that's not very much. The base that was examined was $1 million. That's quite a lot. Are you saying that just isn't in the record? I'm saying that all the record shows that he found errors representing 1 one-hundredth of a percent of Omnicare's total revenues during a period. But he didn't examine the total revenues. No, he didn't. You can't really rely on that. He didn't. Are you asserting that the record would not show what those numbers are as a percentage of what he examined? Correct. And as to the other audits, there are no numbers at all. No, we are reviewing this on a 12-by-6, right? Correct. So we're looking – you look to the complaint. Right. And any documents that are attached to the complaint. And we actually have the questions if you wish to know this. It's a separate matter. But focusing in on paragraphs 82 and 193, which your opponent said are the key paragraphs, why isn't your opponent correct that this is enough to meet at least the scienter and materiality and various other components that your opponent needs to meet? What's your view of the flaw of those paragraphs? Well, the flaw on scienter is that the complaint, first of all, names four individuals as defendants. Three of them are alleged to have obtained the results of these audits on information and belief only. There is no other mention of them in the complaint other than the fact that on information and belief they were provided the results. As Judge Budding found, there is no fact in the complaint that provides the basis for that information and belief. As to Mr. Gamunder, the only allegation in the complaint is that he received the results of one of these audits, which is the new pharmacies audit, which examined seven pharmacies that were acquired by Omnicare. There's no indication in the Stone PTM action or in the complaint in this case whether what was examined were the transactions of that pharmacy before or after it was acquired by Omnicare. There is no fact in the record with regard to the volume of transactions that they found, what errors they found, only that there were some errors and they scheduled a follow-up audit. And there's nothing in Stone's complaint that indicates that after that follow-up audit and correcting those deficiencies that there were any further problems. That's the only audit that Mr. Gamunder is alleged to have been aware of. There is no... Yes, but again, there are no facts other than the fact that he's the chief executive officer of the company that he would have been made aware of these things. Now, as Mr. Fitzpatrick is concerned, all the complaint says is that he brought concerns to the attention of Mr. Gamunder. There's no indication of what those concerns were, what they discussed, and what Mr. Gamunder did or didn't do in response. There's just nothing. It's just a bland statement that I had concerns, I tried to bring them to the attention of management, and it didn't work, and therefore, you know, I decided to leave the company. Mr. Stone wasn't terminated. Mr. Stone left Omnicare a year after these events. He found another job. There's no allegation in the complaint that he was fired. He claimed he was retaliatory, he was discharged as a result of this, but that lawsuit was settled, and there's never been any finding that he was discharged or fired by the company. But I want to get back to objective falsity, because you have to start from what was disclosed here. You've got to look at what the 10K actually said. And the 10K actually said that Omnicare's internal audits had, from time to time, discovered instances of overbilling and overbilling errors, that it believed that it was in material compliance, not full compliance. It said it believed it was in material compliance without full laws and regulations. It said that the government or others may interpret those laws and regulations differently than we do, and that even an inadvertent violation could have very serious financial consequences and could jeopardize Omnicare's ability to continue to participate in those programs. There are 12 pages in the 10K that describes the complex and ever-expanding and ever-changing regulatory scheme under which Omnicare operates. There is disclosure in about seven places in the 10K that Omnicare is constantly being investigated by its regulators. That it's the subject of various unrelated QTAM cases and ongoing investigations. There are six pages. At that point, should we take any account, pro or con, of what happened in this particular QTAM litigation? I think you can, and I think it proves a lot of things. First of all, on Sienner and subjective falsity. When Omnicare was made aware of the existence of the Stone QTAM complaint, it disclosed it and then said, we disagree with Mr. Stone, and we're going to fight. And they did fight, and they won, and they had those claims dismissed. That doesn't show that they believed that their legal compliance statements were false. On the contrary, it shows that they stood behind their statements and fought and won a decisive battle in court. Not once, not twice, but three times, Judge Zabel in the Northern District dismissed those allegations, finding that there was no violation of a fraud statute, the False Claims Act, in connection with Omnicare's billing. These are not boilerplate disclosures that are in the 10-K. They're anything but. The federal securities laws don't require companies to bury shareholders in an avalanche of trivial information. Having told shareholders that internal audits, which is all we're talking about here, have from time to time revealed overpayments and other billing errors, I don't think Omnicare needed to disclose the nitty-gritty details of each and every internal audit conducted of an ancillary part of its business. Mr. Stone was in charge of internal audit. You would have thought that he would have put it best foot forward when he filed his QTAM case. There is not a single allegation in his complaint that the other 98% of Omnicare, its institutional pharmacy business, was engaged in widespread violations of Medicare and Medicaid regulations. He focused only on one tiny sliver of the company's business. The Stone audits are consistent with Omnicare's public disclosures. We said we're not always right. We think we materially comply, but from time to time we're wrong. We're always being investigated. We get sued from time to time. Every shareholder knows that these companies in the highly regulated industry get hit with whistleblower suits. But Omnicare to this day has never admitted, never conceded that it engaged in material violations of Medicare and Medicaid rules and regulations. Never. It believes to this day that the statements that were in its 10-K and have been in every 10-K from the 1990s to now are true and accurate. This court in Omnicare 1 found that essentially the same statement, only it didn't say material compliance, we believe we are in compliance, was not actionable. Here the statement says we're not in material compliance. This is a stronger case for affirmance than Omnicare 1. Now let me talk about materiality for a second. Because it's undisputed that the Stone audits and the PTM complaint that he filed had no adverse impact on Omnicare's business. They were not the final word. Omnicare suffered no penalties, no sanctions, no adverse consequences. And as much as plaintiff will try to disavow asserting that Omnicare had a duty to accuse itself of fraud and says that its theory of the case doesn't require anyone to predict the actions of third parties, as this court observed in Zalewski and in Omnicare 1, in order for a legal compliance statement of belief to be actionable, it must be materially false and misleading, not just false. Here, as in Zalewski and in Omnicare 1, the materiality of the alleged omission of the results of the Stone audits derives solely from the actions of third parties. As in Zalewski and Omnicare 1, there are no facts cited in the complaint to suggest that a company or any defendant internally thought that the Stone audits would lead to severe penalties and adverse financial consequences. I'm sorry, Your Honor? How would an entity like KDC be able to get that kind of information in the course of drafting this complaint? They're duty-bound under Rule 11 to conduct an investigation. They interviewed a dozen former employees of Omnicare. They have CWs listed in their complaint. They had access to Mr. Stone. They had access to Mr. Fitzpatrick. They had access to people who would have been able to give them that information. Suppose they had alleged in the complaint that there was an audit committee that reviewed the audit results and that several of these individuals who were claiming defendants here were on that audit committee. Would that be enough to allege actual knowledge on the part of those individuals? Knowledge of the audits themselves. Knowledge of the audits themselves doesn't prove anything in this case because the audits are immaterial. And the statements that Omnicare made are not objectively false. The audit results are consistent with what Omnicare stated. As opposed to if somebody who was on the audit committee also said, boy, are we in big trouble if you've seen these audits. Then you're getting closer, Your Honor. But you don't have that here. And one final word. I do want to mention loss of causation. I don't want to get lost without talking about loss of causation. Thank you, Your Honor. Thank you, Your Honor. A lot of ground to cover in a short period of time. I guess I'll start first with Omnicare 1. I understand that when a party has success, they tend to see every case that comes along as a mirror image of the case that has previously prevailed. And that's simply not the case. This case is fundamentally different from Omnicare 1. There you had no internal audits or internal reports prepared by anyone, let alone the head of the department responsible for this, in cooperation with the chief compliance officer. There all you had was a few anecdotal reports from a few confidential witnesses who were low-level, who alleged that there were some violations at random places. Then, on top of that, there was no allegation that this information was brought to management's attention with the exception of one confidential witness. But as this court pointed out, the information that was allegedly brought to management's attention, there was a fundamental disconnect between that conduct and the conduct that was alleged to have been revealed in the corrective disclosure. What about your opponent's argument that this only involved a very small fraction, 2% of the individuals involved? I know they speak about that. I recall seeing that for the first time raising their appellate brief, I believe. And I don't believe they actually cite anything in the record for that. I have no reason to doubt that that's true or not. I don't believe it's part of the record. But I will say, if it's that unimportant, why were there such senior people within the company involved in looking at this issue? Why were the two most senior people in the company, whose job it was to assess these things, personally taking part in these audits? And if it's such an immaterial aspect of their business, why did their chief compliance officer, after he saw the results of the first audit, say, hey, we need to follow up, we need to check into this, we need to perform another audit, which, by the way, confirmed the results of the first audit? Now, with respect to the knowledge of Mr. Gumunder in paragraph 82, it's simply not the case, as the defense counsel points out, that this was a generic statement of bringing compliance concerns. You know, for the sake of brevity and relaying, you can't repeat every prior allegation that had been made in the preceding 81 paragraphs into paragraph 82. But if you look, it says the CW5 was Mr. Fitzpatrick. He confirmed the reports of the other confidential witnesses, as well as a key tamer later, Mr. Stone, and brought those to the attention of Gumunder. Well, what are those concerns? Well, they're the only concerns being discussed in the complaint, and those are the concerns of the first two audits, and then ultimately the pharmacy audit, which was brought to Mr. Gumunder's attention by Mr. Stone. But I do want to stress the point here that, again, even if no individual defendant, we've not sufficiently alleged the knowledge on behalf of any individual defendant, we have shown the knowledge of Omnicare through the senior members of management who are not personal defendants here. They don't have to be, as long as you can identify someone. And those are Stone and Fitzpatrick? Yes, Mr. Stone, Mr. Fitzpatrick, and also Mr. Keith, because he was the one who commissioned the Wave 2 audit to check to see if the Wave 1 audit was anomalous, and he was their chief compliance officer. But what is your best case for saying you couldn't use immediate knowledge to do this for people that just stuck to the corporation itself? Well, I think the city of Monroe is one perfect example within the circuit. There are many outside the circuit, and we cite many, but I believe in the city of Monroe, again, so it was a Bridgestone, Firestone. One of the heads of the companies was dismissed as an individual defendant, so he was no longer in the case, yet the court still said that you can impute his knowledge to the corporation for the purposes of establishing the CANTOR. So that was a defendant. That's correct. But you don't have to be a non-defendant, was the point. I'll tell you what it was. It seems troublesome to say – and I'm going to make a hypothesis related to this – to say that you can have somebody who's doing an audit, who's a high-up person doing an audit, and it seems probable, but hypothetically doesn't tell the prevalence of the company and doesn't tell the people who are doing the 10-K filing, but somehow is imputed to the corporation, and the corporation will be liable. Well, generically perhaps, but again, here defendants admit that one of this person's job functions was to review the SEC filing for the specific purpose of seeing their compliance, but more to the point, Mr. Stone is responsible. He was a maker of the statements. That's correct with respect to compliance issues, but also, Your Honor alluded to this, some of the materials that were – we attached our motion for judicial notice. There is a structure. Mr. Stone is head of internal audit. He is duty-bound to report to the audit committee of his findings. The audit committee's charter, then, it says that they are then required to report compliance-related issues to management, and of course, management would include, among others, Mr. Lumunder and all the individual defendants. So we believe we've alleged sufficient facts to show knowledge on behalf of the individual defendants and the corporation. It's strange for Julie that you have two of the most senior people in the company conducting these audits. They both allege that they went and spoke to Mr. Lumunder. The head is in charge of speaking to the audit committee. The audit committee is responsible for reporting to management, yet nobody knew about these audits when they were making their statements that they believed themselves to be in material compliance. And one very last point on the issue of fraudulent intent. Whether or not these decisions of not compliance arose to the level of criminality is utterly beside the point. The company didn't say here, we believe we're materially not committing criminal acts. They didn't say, we don't believe we're committing False Claims Act violations. They said, we don't believe that we're not compliant, and they're more than capable of making that determination themselves without any third party. That's why they have an internal audit function. That's why they have a head of internal compliance. That's why, as defendants admit, they reimbursed some of their claims because they're more than capable of making their own determinations as to compliance. Thank you, Your Honor. The case will be submitted.